UNITED STATES (CASTRO v.). See Cases Nos. 2,508 and 2,509.

## Case No. 14,755.

### UNITED STATES v. The CATHARINE.

[2 Paine, 721;[1] 3 Law Rep. 255.]

Circuit Court,[2] New York. 1840.

SLAVE TRADE—EMPLOYMENT—CONFISCATION—DELIVERY OF VESSEL—PREPARATIONS OF VESSEL AND CARGO.

1. An American vessel, on her outward voyage to the coast of Africa, for the purpose of taking on board a cargo of slaves, is, before any slaves are received on board, "employed or made use of," within the act of congress of May 10th, 1800 [2 Stat. 70], "in the transportation or carrying of slaves from one foreign country or place to another."

---

[1] [Reported by Elijah Paine, Jr., Esq.]
[2] [District not given.]

2. To be employed in anything, means not only the act of doing it, but also to be engaged to do it, to be under contract or orders to do it.

3. And if the outward voyage under the American character and ownership be planned and undertaken with a view and under an arrangement that the ownership and national character are to be changed on the arrival of the vessel on the coast of Africa, and that she is then to be employed in the transportation of slaves, she comes clearly within the mischief and within the true intent and meaning of the act of congress.

4. And, in such a case, the confiscation is not limited to the American interest held in the vessel at the time she is engaged in the actual transportation of slaves. It is not the true construction of the act that the whole adventure must be performed whilst the vessel retains her American character and ownership. The penalty is incurred and the forfeiture attaches from the very inception of the voyage. The vessel becomes tainted with the offence wherever she may go, or into whatever hands she may fall, and the forfeiture attaches upon all interests concerned.

[Cited in U. S. v. Greathouse, Case No. 15,-254.]

5. But a bona fide sale of a vessel, to be delivered at any given place on the coast of Africa, unconnected with the ulterior employment of the vessel, and not in aid of an employment in the transportation of slaves, would not subject her to forfeiture within the act of congress.

6. Where a voyage to the coast of Africa is commenced and prosecuted under strongly suspicious circumstances, accompanied with preparations and a cargo taken, such as are usually employed in voyages in the slave trade, it is incumbent on the claimant to explain and remove such suspicious circumstances by clear, explicit and unequivocal proofs.

This was an appeal from a decree of the district court of [the United States for] the Northern district of New York, awarding restitution of a vessel captured as a slaver, and libelled by the United States. The libel contained several articles, but the following was the only one on which condemnation was sought at the trial: "Fifthly, that a certain schooner or vessel called the Catharine, being the property, wholly or in part, of a citizen or citizens of the United States, or of persons residing within the United States, to the said libellant unknown, was heretofore, to wit, on or about the first day of July, in the year of our Lord, 1839, employed and made use of by some person or persons being a citizen or citizens of the United States, or being a person or persons residing within the United States, to the said libellant unknown, in the transportation and carrying of slaves from some foreign country to the said libellant unknown, to some other foreign country or place to the said libellant unknown, contrary to the form of the statute in such case made and provided, being the act of congress, entitled 'An act in addition to the act entitled An act to prohibit the carrying on the slave trade from the United States to any foreign place or country,' approved May 10th, 1800." The libel prayed the forfeiture and condemnation of the vessel.

A claim was put in by Charles Tyng, setting up the following facts, viz.: That he was a native citizen of the United States, but that he had resided at Havana as a ship broker and commission agent since October, 1837. In May, 1839, the Catharine, a registered vessel of the United States, built and owned in Baltimore, arrived at Havana, under the command of William J. Wedge, a citizen of the United States. He represented himself as the agent of R. W. Allen and John Henderson, citizens of Baltimore, the owners of the vessel, to effect a sale of her; and had a power of attorney from them for that purpose. He employed Tyng to sell her; and the latter, in June following, sold her, as he supposed, to Martinez & Co., of Havana, for $7,750, and delivered possession of her to them. Wedge being anxious to return in a vessel sailing for the United States, Tyng advanced him the price of the vessel before he had received it himself, and took from Wedge a power of substitution, to enable him to transfer the vessel. About ten days afterwards, however, the purchasers having discovered some objections to the vessel, refused to complete the purchase and pay the price. But in the interval, the sale being supposed complete, one of the house who had purchased her, desired Tyng to effect a charter of the vessel to John S. Thrasher, a citizen of the United States, which he accordingly did. The charter party was between Tyng, as agent of the owners, and Thrasher, and was for a voyage to Principe or other ports on the coast of Africa, of eight months, at three hundred dollars per month; and if the vessel should be at sea at the expiration of the eight months, the charter to continue until she arrived in port. By the terms of the charter party, Thrasher was to victual and man her. Finding that he could not compel Martinez & Co. to pay for the vessel without a lawsuit, which he wished to avoid, Tyng sold the vessel, about the 25th of June, to one Teran, of Havana. By the contract of sale, which was reduced to writing, Teran agreed to purchase the vessel for $10,000, provided she should be delivered to him at the port of Bona, on the coast of Africa, on or before the first of October, and to pay in advance $7,500, and the balance at Havana on receiving satisfactory evidence of the delivery of the vessel at Bona; and Tyng was to be at liberty to load or charter the vessel until the day of her delivery at Bona, and was to refund the sum advanced in the event of failing to deliver her. Previous to effecting the contract of sale to Teran, Tyng applied to Thrasher to modify the charter party, representing to him the hardship of the case; and the latter, induced by such representations, thereupon agreed, in writing, to modify his charter party so as to enable Tyng to deliver the vessel at Bona by the first of October, relinquishing his right to her after his cargo should be landed at Principe. Thrasher loaded the vessel with a cargo which appeared, by the bill of lading and invoice, to be worth about $6,000. The principal articles were one hundred half-pipes of brandy, valued at $1,500, and two thousand

two hundred and seventy-five bales of leaf tobacco, valued at $2,275. There were also fourteen large hogshead shooks. ten long do. do., one boiler for clarifying, one thousand five hundred feet of white pine boards, and eleven pieces of joist. The rest of the invoice was ordinary merchandise. The cargo was consigned to one Pereyra, and the vessel sailed for Principe under the command of one Peterson. About the 30th day of August the vessel was forcibly seized and taken possession of by the Dolphin, a foreign armed vessel; and Robert H. Dundas having been placed in command of her, she was brought by him into the port of New York. The pretence for the seizure was that she was a slaver; and though sailing under American colors, was, in reality. owned by Spaniards. The claim of Tyng concluded with averring, that he had been sued by Martinez & Co., at Havana, to recover back their advance; that Allen & Henderson had refused to repay the money advanced by him, on the ground that he had made the vessel his own; and that she was, in fact, his property, and at the time of the capture under his control, and had not been engaged in the slave trade; and that he had never intended to employ her in such trade.

Petitions were also filed by Michael, the mate, and Foxcroft, one of the mariners, alleging that the vessel was engaged on a lawful voyage, or that they supposed it to be so; and that if it was broken off, it was not their fault, but the fault of the master and owners, and praying their wages.

The following facts were proved by the deposition of Robert H. Dundas, a mate or passed midshipman in the British navy, examined on the part of the United States: On the 13th of August, 1839, he was serving on board the brigantine Dolphin, a British national vessel, commanded by Lieutenant Holland, and cruising off Cape St. Pauls. on the coast of Africa. On that day, while sailing in a north-east direction towards the land, they fell in with and gave chase to the Catharine, which was then about three or four miles off the cape. steering south-west, off the land. She showed no colors. but hoisted American colors after about two hours' chase, and after the Dolphin had fired several shots. When they first saw her she was distant, at north-west, about three or four miles, and the wind was at W. N. W. They finally compelled her to heave to, and Dundas boarded her as examining officer, and found Peterson in command. He demanded the register, crew-list, invoice of cargo, American log-book. and some other papers, which Peterson delivered to him. In about one hour Lieut. Holland came on board and searched Capt. Peterson, and found the following paper concealed on his person: "The main thing for you to do on this voyage is to be ready, in case you are boarded by a man-of-war, to show your log-book, which must be regularly kept from the time you leave here, your ship's papers, your charter party for the voyage, your ship's roll and instructions; and you are, in that event, to take all command with your American sailors, according to your roll; all the others are to be passengers. You are to be very careful that. in any cross questions, you do not commit yourself, but always stick to the same story. When the vessel is discharged, you must at once cut your register in two pieces; one piece you must enclose direct and send to Messrs. Thomas. Wilson & Co., Baltimore; the other piece you will bring with you and give to me when you return here. You must be very particular about that, and do not let any time pass after the cargo is out before you cut the register in two pieces. and be careful to keep them separate. Throw one piece overboard if you are obliged to by being boarded by a man-of-war." Peterson, who was very drunk. resisted the search, and it took several persons to hold him; within half an hour afterwards they found a Spanish log-book of the voyage, kept cotemporaneously with the American log-book, from the 29th of June to the 12th of August, and several other papers in Spanish and English. The Spanish log-book was found in the trunk of one of the Spaniards, some of the other papers in trunks of the other Spaniards, and some were found loose forward. They picked up every paper they could find. Among the papers was a letter of instructions from Thrasher to Peterson, dated June 28th, the only material part of which was as follows: "As soon as your vessel is ready for sea, you will proceed to the Isle of Principe, and on your arrival there you will consign your vessel and cargo to Joseph Pereyra, Esq., and deliver him the certified invoice herewith enclosed. Should he wish you to proceed to any other port or ports on the coast of Africa, with or without a cargo, you will implicitly obey his instructions, as he has my full power to act as he may see fit for my interest. You will be particularly careful, however, not to receive on board said schooner any cargo that is contraband, or that is not allowed by the laws of the United States to be laden on board American vessels. A number of persons having applied to me for passage out in the schooner, I have consented; but you will take care that their passports are in order, and that there are no circumstances attending them which will be likely to bring you into the least difficulty." Among the papers were also the shipping articles, headed. "No ardent spirits allowed on board," and signed by four seamen purporting to be native Americans. and two foreigners; the crew list corresponding with the shipping articles; the charter party, bill of lading and invoice the same as set forth in the claim of Tyng; American protections for the four seamen shipped as Americans; a register of the vessel taken out at Baltimore; a list of twenty-four persons, Spanish or Portuguese, with designations showing them to compose

the officers and mariners of a ship's company, at the head of which was Pereyra as master; the plan of a slave deck drawn on paper; and several papers in Spanish and Portuguese not deemed material. There was also the following agreement signed by Pereyra: "It is mutually agreed between F. A. Peterson and Joseph Pereyra, the former master and the latter supercargo of schooner Catharine, of Baltimore, now bound on a voyage to the coast of Africa, that said F. A. Peterson shall go out master of said schooner on her present voyage, for the sum of one hundred dollars per month and three hundred dollars gratification, the wages to continue until his return here, should he return in the vessel, or any other vessel belonging to the house for which J. Pereyra is agent. But should said Peterson wish to leave the vessel on the coast, said Pereyra binds himself hereby to pay unto said Peterson three hundred dollars gratification, and his wages up to the day he leaves the vessel, less one hundred dollars received here as one month's advance. Jose Pereyra. Havana, June 28th, 1839."

The deposition of Dundas further proved that the crew consisted of eight persons with American protections, including the captain. There were also on board twenty or twenty-five foreigners, mostly Spanish or Portuguese; six or eight men would be quite sufficient to navigate the vessel in a lawful trade; witness came over to New York in her with six men. They found on board a large boiler or cooking apparatus sufficient to cook for three hundred people; a quantity of lumber which was marked and numbered for laying a slave deck, and could easily have been put up in a few hours as a slave deck after the cargo was discharged: a number of wooden vessels, some made up and some in shooks; about nine were made up and there were materials for about six more; each would have contained from four to six hundred gallons. They also found five hundred and seventy wooden spoons, similar to those used in slave vessels, and thirty-six large tin dishes and a number of small ones. These equipments are generally found in slave vessels, and witness had never seen them anywhere else. They found no irons, but they are generally concealed in the lower part of the vessel. All the persons found on board, with the exception of Capt. Peterson, the American mate, one American seaman, and Pereyra, were landed at Quitta, a port a few miles east of Cape St. Pauls, and much resorted to by vessels for water and provisions. Witness then took the vessel to Sierra Leone, and laid the papers before the mixed commission, but they refused to take jurisdiction of the case on the ground that the Catharine was sailing under an American register. He then, pursuant to orders, brought her to the United States, and arrived here the 6th of October, 1839. The day after their arrival Pereyra committed suicide. The cargo found on board corresponded with the invoice, and was such an one as an honest trader would have on board trading with the coast of Africa; it was also such an one as a slaver would have on board; the lumber and large boiler would excite witness' suspicion; the vessel was not in a condition to receive slaves until her cargo was discharged, and a slave deck could not have been put up until then; had the vessel been condemned at a port where a mixed commission was sitting, witness would have had a share as prize-money of the vessel and cargo; if she should now be condemned he would not say whether he would be entitled to anything or not; he had done nothing to assert or relinquish any claim he might have.

Michael the mate, who had filed a petition for wages, was also examined on the part of the libellants. The only material parts in his deposition not otherwise stated, are the following: He entered on board the Catharine, on the 26th June, at Havana. He entered and signed the articles or shipping-list by the name of Ebenezer Tucker, of Salem, Massachusetts, and as an American citizen; he was, however, a native of Scotland. He so entered because he could not enter without an American protection. This was suggested to him by the shipping-master, who furnished him with a protection in the name of Ebenezer Tucker. The vessel sailed from Havana on the 28th of June; she had on board about twenty-eight or thirty persons; the majority were Spanish or Portuguese; Capt. Peterson and not witness kept the log-book; the Spaniards or Portuguese used to lend a hand in working the vessel; as far as he knew they were passengers; some of the crew were employed in making sennett; it is yarns plaited together, and is used in putting around ropes and rigging to prevent chafing; a good deal of it was made on board, but it was all used in putting round the rigging, to the best of his knowledge; he did not know what cargo they had on board, nor that there was any intention of going to any other place than the Island of Principe; he did not ship for the purpose or with the intention of engaging in the slave trade; when the Dolphin boarded the Catharine she was about five miles from Quitta; being short of water and provisions they had been there to get a supply, and were bound to Principe when they were captured; they were at Quitta only a few hours.

Foxcroft, who had filed a petition for wages, was examined as a witness, both for the claimants and libellants. His deposition contained no material facts, except the following:—He shipped on board the Catharine, at Havana, as a seaman, and signed the shipping articles by the name of Joseph Mackie; he had an American protection when he shipped; Capt. Peterson knew nothing of his shipping under a wrong name; he did not ship for the purpose or with the intention of being engaged in the slave trade, and there

was not, to his knowledge, any such purpose or intention on the part of any on board; the reason of his shipping under a wrong name, was because he could not ship on board an American vessel without an American protection, and there was no other vessel in which he could ship; the protection was given him by the shipping-master, at Havana; he was not an American citizen, but a British subject; witness, while on board the Catharine, was engaged in making sennett, under the directions of the boatswain's yeoman, who told him it was to be used in tying slaves; they made a very great quantity; many were engaged in making it, and more was made than was necessary for the use of the vessel; there was a good deal on board unused at the time of the capture, as much as one hundred fathoms.

The counsel for the libellants admitted all the facts set forth and averred in the claim of Tyng.

The district court dismissed the libel, and ordered the vessel to be delivered up to the claimant. It also dismissed the seamen's petitions for wages, on the ground that the vessel was not under arrest thereupon, and there being no proceeds or avails in court upon which said petitions could attach. On pronouncing it, the district court delivered the following reasons for its decree:

This is a prosecution in rem, seeking the forfeiture of the vessel for being engaged in the slave trade. The bill articulates upon various acts of congress, charging against the vessel the circumstances which incur a forfeiture by the provisions of these acts. On the hearing, however, the contestation between the parties was limited to the fifth article alone. That allegation is, that the schooner being the property, wholly, or in part, of a citizen or citizens of the United States, or of persons residing within the United States to the libellant unknown, was, on or about the first day of July, 1839, employed and made use of by some person or persons residing within the United States to the libellant unknown, in the transportation and carrying of slaves from some foreign country or place to the said libellant unknown, to some other foreign country or place to the libellant unknown, contrary to the act of congress of May 10th, 1800. It is admitted that the ownership of the vessel is in citizens of the United States, and it is unnecessary, under the view the court takes of the case, to enter upon the question whether the claimant has shown a lien or privilege in respect to his advances to the owner, which would be protected in case of the condemnation of the vessel. On the 15th of June, 1839, the claimant, as agent of the owners, chartered the vessel to John S. Thrasher, for a voyage from Havana to the Isle of Principe, or other part or parts of Africa, as the agent of the charterer may direct. The vessel was laden and despatched by the charterer, and was

captured on the 13th of August, in the prosecution of her voyage, by a British cruiser near the coast of Africa. The supreme court having decided, in the construction of this statute, that "the vessel in question was employed in the transportation of slaves within the meaning of the act, if she was sailing on her outward voyage to the African coast, in order to take slaves on board to be transported to another foreign country," I should have no difficulty, upon a careful review of the facts and circumstances, in deciding that the charge of the libel had been fully sustained against the vessel, if the charter party, and her outfit and the proceedings under it, were the controlling facts of the case.

Looking at the case in this point of view, I am not able to discover that it can be distinguished favorably to the claimant, from the case of The Butterfly [unreported], recently decided in this court. The pertinency and weight of a similar class of facts and circumstances were fully considered by the court in that case, and it may be added that some particulars exist here which would probably be regarded as rendering the inferences and presumptions then recognized and adopted, still more direct and conclusive. It seems to me, however, that the enterprise assumes a new character subsequent to the execution of the charter party, and so far as the charge in the libel now under consideration may be made to affect it. On the 25th of June the claimant contracted to sell the vessel to one Teran, for $20,000, and to deliver her at Bona, on the coast of Africa, on or before the first day of October thereafter, and received $7,000 of the consideration-money in advance. On the same day the charterer made in writing a modification of his charter party, and engaged to relinquish the vessel "after the cargo I have now on board is landed at the Isle of Principe in accordance with the bill of lading," to enable the claimant to deliver the vessel to Teran, at Bona, according to his contract. It is not to be concealed that this whole arrangement bears the semblance of being a common concern between Thrasher and Teran, in respect both to the charter and purchase. A scrutiny of the evidence cannot fail to make the impression that the two acts were preconcerted parts of the enterprise; that the vessel should wear her American character to the coast of Africa, with a view probably to avoid the application of the treaty between England and Spain, and the hazard of interception by British cruisers; and that when there, she should become Spanish, before venturing on her return voyage, lest the officers and crew might be declared pirates under the act of congress of May 15, 1820. If this be so, it would tend to confirm the verity of the representation that this was an actual contract of sale, and that the vessel at Bona was to become wholly Spanish property. This particular is of great importance in determining the application of

the act of congress to the case. There is certainly nothing in that act inhibiting an American vessel from carrying any description of cargo to the coast of Africa. She may be legitimately let on freight or chartered for such a voyage. If everything she undertakes to do as a vessel of the United States, be to carry out and deliver a cargo, she would not, in fulfilling such an engagement, come within the prohibitory enactments of the statute. The statute reaches her only when the evidence shows that her outward voyage is only in part fulfilment of her employment as an American vessel, which is to be continued and consummated by transporting slaves into some other foreign country. The broadest latitude the supreme court gives to the term "employment," as evidence of such illegal voyage, falls short of being satisfied by the mere transportation of an outward cargo. The decision requires that it shall further appear that the vessel was on such outward voyage for the purpose of taking on board a cargo of slaves, as part and parcel of the adventure. In a prosecution of persons serving on board such vessel, it may be of no importance whether the vessel was to retain or change her national character after reaching the outward port, provided the whole enterprise was to be regarded as one voyage.

But it is apprehended a prosecution under the first section against the vessel, cannot be sustained without showing that the whole adventure contemplated by her, is to be performed by her in her American character. The terms of the section are these: "That it shall be unlawful for any citizen of the United States, or other persons residing within the United States, directly or indirectly to hold or have any right or property in any vessel employed or made use of in the transportation or carrying slaves from one foreign country or place to another, and any right or property belonging as aforesaid shall be forfeited," &c. The penalty of this act is plainly levelled against American property employed as inhibited, and the confiscation is limited to the American interest held in a vessel at the time she is employed in the slave trade. There is nothing in this statute to reach the case of an American vessel built and fitted out for the slave trade, but actually sold to a foreigner and employed by him. What, then, is the application of the act to the facts of this case? Upon the proofs, I am satisfied the vessel was chartered, fitted out and laden at Havana, with intent to be employed in the slave trade, prohibited by this act, and it is settled by the decision of the supreme court upon the import of the term "employed," as used in this act by congress, that "to be employed in anything, means not only the act of doing it, but also to be engaged to do it," and, accordingly, the chartering and fitting out the vessel at Havana, with design to have her perform the voyage then arranged, brought the trans-

action within the prohibition of the act; and had the seizure been made under that state of facts, the condemnation of the vessel must have been pronounced by the court. The proof, however, is equally strong that in this incipient state of the enterprise, the voyage was changed, and the vessel was then put under "contract and orders," to carry out a cargo and freight, and deliver it at Principe, to the charterer, in fulfilment of the contract of sale. There is nothing beyond vague suspicions to warrant this ulterior change of the destination of the vessel with the voyage first contemplated. St. Thomas and Principe are near the equator; if the Bona to which the vessel was directed, be the port in Algiers, the great distance of the two points apart would strongly denote an entire disconnection of the undertaking. No evidence was offered that there was any place of that name in the vicinity of Principe, nor other fact evincing the object of the voyage to be continuous and identical, and I am, accordingly, bound to hold, upon the testimony, that the vessel sailed from Havana to deliver a cargo at Principe, and was then wholly discharged and separated from that employment, and was after that to be taken to Bona, and delivered to the purchaser. This adventure, prosecuted with such intent, cannot be brought within the interdiction of the statute, and I shall, therefore, decree that the libel be dismissed, and the vessel delivered up to the claimants.

I am aware that this is a point of importance and difficulty. My duty, however, is to express the result of my own reflections upon the subject, and this I do with the greater promptitude, because, from the magnitude of the question and interests involved in the decision, the judgment now pronounced will be submitted to the review of the appellate courts.

There being no condemnation of the vessel, the petition of the seamen for wages out of the proceeds must be also determined.

Ordered, that the libel be discharged, and the schooner Catharine, her tackle, &c., be delivered up by the marshal to the claimant.

From this decree the libellants appealed. On the trial in this court, in addition to the proofs taken in the court below, only one witness was examined. He stated, on behalf of the libellants, that in the month of September, 1840, on taking out the cargo of the Catharine which had not before been removed, there were found near the bottom of the hold two bags containing iron manacles or handcuffs. The witness stated that the manacles in one of the bags were counted, and were found to be one hundred and seventy-five in number; and that the other bag was about the same size, and appeared to contain about the same number, but its contents were not counted.[3]

---

[3] See note 2 at end of case.

B. F. Butler and M. S. Bidwell, for appellants.

C. O'Conor and F. B. Cutting, for respondents.

THOMPSON, Circuit Justice. This case comes up on an appeal from the district court for the Southern district of New York. The proceeding in the court below was for an alleged forfeiture of the vessel, for a violation of the act of congress of the 10th May, 1800 (3 Story's Laws, 382 [2 Stat. 70]), which declares that it shall be unlawful for any citizen of the United States, or other person residing within the United States, directly or indirectly to hold or have any right or property in any vessel employed or made use of in the transportation or carrying of slaves from one foreign country or place to another; and any right or property belonging as aforesaid, shall be forfeited. The supreme court, in the case of U. S. v. Morris,[4] 14 Pet. [39 U. S.] 473, have given a construction to the term "employed" as here used in this act. The question, say the court, in this case is, whether a vessel on her outward voyage to the coast of Africa, for the purpose of taking on board a cargo of slaves, is "employed or made use of" in the transportation or carrying of slaves from one foreign country or place to another, before any slaves are received on board? To be "employed," say the court, in anything means not only the act of doing it, but also to be engaged to do it, to be under contract or orders to do it. And this is not only the ordinary meaning of the word, but has frequently been used in that sense in other acts of congress. That the vessel in question was employed in the transportation of slaves within the meaning of the act of congress, if she was sailing on her outward voyage to the African coast, in order to take them on board, to be transported to another foreign country. That the Catharine was an American vessel, sailing under the American flag, and documented as an American vessel, is not denied; and the claimant, Charles Tyng, who interposes his claim as owner, was an American citizen. This would seem to bring the case directly within the prohibition in the act, and subject the vessel to forfeiture; and, indeed, the district judge in the court below, declares that he should have no difficulty, upon a careful review of the facts and circumstances, in deciding that the charge of the libel had been fully sustained against the vessel, if the charter party and her outfit, and the proceedings under it, were the controlling facts in the case. That the pertinency and weight of a similar class of facts and circumstances were fully considered by the court in the case of The Butterfly [unreported], recently decided in this court, where the vessel was condemned; and the learned judge adds, that some particulars exist here which would probably be regarded as rendering the infer-

ences and presumptions then adopted and recognized, still more direct and conclusive; but that it seemed to him that the enterprise assumed a new character subsequent to the execution of the charter party. That there is nothing in the act inhibiting an American vessel from carrying any description of cargo to the coast of Africa; she may be legitimately let on freight or chartered for such a voyage. If everything she undertakes to do as a vessel of the United States, be to carry out and deliver a cargo, she would not, in fulfilling such an engagement, come within the prohibitory enactments of the statute. The statute reaches her only when the evidence shows her outward voyage is only in part fulfilment of her employment as an American vessel, which is to be continued and consummated by transporting slaves into some other foreign country.

I am not disposed to give a construction to this act which will interdict an American vessel from carrying out a cargo, and delivering it upon the coast of Africa, if unconnected with the subsequent employment of the vessel in the transportation of slaves; but I am not prepared to admit that such subsequent employment must be in the character of an American vessel, in order to bring her within the prohibition in the act. If the circumstances are such as to warrant the conclusion that the outward voyage, under the American character and ownership, was planned and undertaken with a view, and under an arrangement, that the ownership and character were to be changed on the arrival of the vessel on the coast of Africa, and there to be employed in the transportation of slaves, such vessel would clearly come within the mischief, and, I think, within the true intent and meaning of the act of congress.

There can be no doubt but that a bona fide sale of a vessel, to be delivered at any given place upon the coast of Africa, unconnected with the ulterior employment of the vessel, and not in aid of an employment in the transportation of slaves, would not subject her to forfeiture within this act of congress; but where the voyage is commenced and prosecuted under strong and suspicious circumstances, accompanied with preparations, and the vessel laden with a cargo such as are usually employed in voyages of this description, it imposes no unreasonable hardship upon a party to call upon him to explain and remove such suspicious circumstances. If the adventure is innocent, it may easily be shown to be so. The language of the supreme court, in the case of The Josefa Segunda, 5 Wheat. [18 U. S.] 356, is very strong on this point.[5] In the execution of these laws (the suppression of the slave trade), no vig-

---

4 See note 3 at end of case.

5 When any act is done, which of itself, and unexplained, is a violation of law, and a party to extricate himself, or his property, from the consequences of it, resorts to the plea of necessity or distress, the burden of proof is not only thrown upon him; but when the temptation to in-

ilance can be excessive, and restitution ought never to be made but in cases which are purged of every intentional violation by proofs the most clear, the most explicit and unequivocal. But let us look a little at the circumstances of this case, and see whether they are not such as call upon the party to give a more satisfactory explanation. The claimant, Charles Tyng, alleges that he is a citizen of the United States, residing in Havana since the year 1837, and engaged in the business of a ship-broker and commission agent; that some time in the latter part of May, 1839, the schooner Catharine, an American vessel, arrived at the Havana, under the command of William J. Wedge, a citizen of the United States, who applied to him, and represented that he was authorized by R. W. Allen and John Henderson, citizens of Baltimore, and owners of the Catharine, to effect a sale thereof, and employed him for that purpose. That he succeeded in effecting a sale to the house of Don Pedro Martinez & Co.; which sale, however, owing to some misunderstanding, fell through. He, however, feeling confident that the bargain would be consummated, had advanced the purchase-money to Wedge, and he had returned to Philadelphia, after having made him his substitute under the letter of attorney from Allen & Henderson. He afterwards effected a sale of the vessel to Don Teran, of Havana, but had previously chartered her to one Thrasher, who agreed so to modify his charter party as to meet the terms of sale to Don Teran. Under these circumstances, the Catharine sailed from the Havana, on her voyage to the coast of Africa, and was captured by the Dolphin, a British armed vessel, and brought into the port of New York.

These are the general outlines of the case; but a more particular examination of the various circumstances are necessary to a proper understanding of the transaction.

It is proper, in the first place, to notice, that although the claimant, Charles Tyng, was originally an authorized agent to sell the vessel for Allen & Henderson; yet they, having received the purchase-money from him, through Capt. Wedge, refused to refund it, and threw the vessel upon his hands. He, therefore, interposes his claim as owner, and alleges himself to be such. His sale to Teran bears date the 25th of June, 1839, and was for the consideration of $10,000, provided the vessel was delivered to him at the port of Bona, on the coast of Africa, on or before the 1st day of October. Part of the purchase-money was to be paid in advance, and the balance on receiving satisfactory evidence of the delivery of the vessel at Bona; the said Charles Tyng being left at liberty to load or

fringe the law is great, and the alleged necessity, if real, can be fully and easily established, no court should be satisfied with anything short of the most convincing and conclusive testimony. Livingston, J., in The Josefa Segunda, 5 Wheat. [18 U. S.] 338.

charter the vessel until her delivery at Bona; the money advanced to be refunded to Teran, in case of failure to deliver the vessel at Bona on or before the 1st of October. The vessel having been captured before her arrival on the coast of Africa, the sale and transfer of the property in the vessel was never consummated, but remained in the original owner: and whether that ownership was in the house in Baltimore or in Tyng, is immaterial; though Tyng asserts himself to be the owner, and must be dealt with as such. He was the owner on the outward voyage, and at the time of the capture. If he was such owner, and the vessel was employed in the transportation of slaves, according to the decision of the supreme court in the case of U. S. v. Morris [14 Pet. (39 U. S.) 464], how does the act of congress affect his interest in the vessel? It declares that it shall be unlawful for any citizen of the United States, directly or indirectly to hold or have any right or property in any vessel employed or made use of in the carrying or transportation of slaves from one foreign country or place to another; and any right or property belonging as aforesaid, shall be forfeited. The forfeiture attached upon the violation of the prohibition—and that violation occurred the instant the vessel was employed in the transportation of slaves, or, in other words, at the commencement of the voyage, if such voyage was prosecuted with the view, and for the purpose of transporting slaves from one foreign country or place to another foreign country or place. That such was the purpose for which this vessel was purchased by Teran, and was proceeding to the coast of Africa, admits of but little doubt. It was intimated on the argument, that there was no such place as Bona on the west coast of Africa, where the slave trade is carried on; and if the vessel was to be delivered at Bona, on the coast of Algiers, it afforded no ground of suspicion. But this suggestion was so utterly improbable, that it was not pressed there, and is entitled to no consideration. That there is such a place as Bona, (as known and understood by the parties,) on the west coast of Africa, cannot admit of a doubt.

The charter party entered into between the claimant and Thrasher, bears date on the 15th day of June, 1839, for a voyage from Havana to Isle of Principe or other port or ports on the coast of Africa, as the agent of the charterer, may direct; the charterer to provide a crew, and furnish them with all necessary provisions, &c., for their maintenance during the voyage, and to pay all port charges; the charterer to pay $300 per month for eight months, and if the vessel should be at sea at the expiration of said term, the charter party to continue until her arrival, and the cargo shall be discharged. The charterer gave to Capt. Peterson, the master of the vessel, instructions to proceed to the Isle of Principe, and on his arrival there, to consign the vessel and cargo to Joseph Perey-

ra, and deliver to him the certified invoice enclosed in the letter of instructions, and giving him directions implicitly to obey the instructions of Pereyra. And in his letter of instructions he says: "A number of persons having applied to me for passage out in the schooner, I have consented; but you will take care that their passports are in order, and that there are no circumstances attending them which will be likely to bring you into the least difficulty." Pereyra, the consignee of the charter, was at Havana, and went out as supercargo. It appears, from the deposition of Robert H. Dundas, mate of the Dolphin, that when the Catharine was captured, the witness demanded of the captain his papers, and a number were delivered up, which are unimportant to be noticed here. Soon after, Lieut. Holland came on board the Catharine, and Capt. Peterson was searched, and there was found concealed on his person a certain paper, which among the exhibits is marked No. 33, and which will be hereafter noticed. From this deposition of the mate, it appears that the crew of the Catharine consisted of eight persons, with American protections, including the captain, and about twenty or twenty-five foreigners, mostly Spanish and Portuguese; that six or eight men would be quite sufficient to navigate the Catharine in a lawful trade; that there was found on board a large boiler or cooking apparatus, sufficiently large to have cooked for three hundred people; a quantity of lumber, which was prepared and numbered for laying a slave-deck, and could easily have been put up as a slave-deck in a few hours after the cargo was discharged; a number of leagers were found on board, some made up and some in shooks—about nine were made up, and materials for about six more; each would contain five or six hundred gallons. There were found on board about five hundred and seventy wooden spoons, similar to those used in slave vessels; there were thirty-eight large tin dishes, and a number of small ones; that the equipments above mentioned are such as are usually found on board of slave vessels, and he has never seen them elsewhere. They found no irons, but they are generally concealed in the lower part of the vessel; and from the evidence taken in this court upon the appeal, it appears that two bags of iron manacles were found concealed under the cargo; one was counted and contained one hundred and seventy-five, and the other appeared to be about the same size. The mate further testified, that the Catharine was captured three or four miles from Cape St. Pauls; that the cargo found on board was such an one as an honest trader would have on board, trading with the coast of Africa, and it was also such an one as a slaver would have on board; that the lumber and large boiler would excite suspicion. The document before referred to, which was found on the person of the master, although without date or signature, is deserving of no-

tice; it is as follows: "The main thing for you to do on this voyage is to be ready, in case you are boarded by a man-of-war, to show your log-book, which must be regularly kept from the time you leave here, your ship's papers, your charter party for the voyage, your ship's roll and instructions; and you are, in that event, to take all command with your American sailors, according to your roll, all the others are to be passengers. You are to be very careful that in case of any cross-questions you do not commit yourself, but always stick to the same story. When the vessel is discharged, you must at once cut your register in two pieces. One piece you must enclose direct, and send to Messrs. Thomas Wilson & Co., Baltimore; the other piece you will bring with you, and give to me when you return here. You must be very particular about that, and do not let any time pass after the cargo is out before you cut the register in two pieces, and be careful to keep them separate. Throw one piece overboard if you are obliged to by being boarded by a man-of-war."

It is not very certain from whom this document emanated. It must have been from some person having an interest in the vessel or in the voyage, and most probably either Thrasher, the charterer, or Teran, the conditional purchaser. The language as to the disposition of the register would seem more appropriately to come from Teran, who was to become the owner. But from whomsoever it came, being found on board the vessel, and forcibly taken from the master, it was a document connected with the voyage, and bears evident marks of suspicion that the adventure was not in reality what it purported ostensibly to be, a fair and legal voyage to the coast of Africa. If it had been, no disguise would have been necessary. The direction, in case of being boarded by a man-of-war, to take all command with the American sailors, and all the others to be passengers, shows that they were not in reality passengers, but connected with the vessel, and were to assume the character of passengers as a disguise. It is, in the first place, highly improbable that any persons should be going out to that part of the coast of Africa as mere passengers. But considering them connected with the ulterior employment of the vessel in the transportation of slaves, their being on board is easily accounted for. When a cargo of slaves was taken on board, it would require the vessel to be manned by a greater number than would be required for the mere navigation of the vessel. From a careful examination of the proofs in this case, I am satisfied that this vessel was chartered, fitted out and laden at Havana, with intent to be employed in the slave trade, prohibited by the act of congress of the 10th of May, 1800. And the circumstances connected with and attending the outward voyage, in my judgment, lead irresistibly to the conclusion that the arrangement made with respect to the

conditional sale of the vessel, and the delivery of the possession at Bona, was a part of the contrivance to avoid the interruption of the adventure by capture. If this was a real and bona fide sale of the Catharine, it is a little remarkable that no person is designated to whom possession was to be given at Bona. Teran, the purchaser, was in Havana, and would not himself take the possession. It appears by the letter of instructions to Capt. Peterson, from Thrasher, the charterer, that the vessel and cargo were to be consigned to Pereyra, who went out as supercargo. But there is nothing showing any connection between him and Teran. If the outward voyage of this vessel to the coast of Africa was unconnected with the subsequent employment of the vessel in the transportation of slaves, it certainly requires explanation why she was so peculiarly fitted, in every respect, for the transportation of slaves; and, unexplained, they lead irresistibly to the conclusion that the whole was one connected scheme to send out this vessel to be employed in the transportation of slaves. If this was a concerted plan between Thrasher and Teran in the purchase and charter of the vessel, the more easily to elude capture and condemnation, it is difficult to conceive how Tyng, the claimant, could have been ignorant of the object and purpose for which this arrangement was made, and he must, therefore, be considered a party to it, and the whole must be taken to be one continuous enterprise; and if so, the mere change of property in the vessel after her arrival on the coast of Africa, could not legalize the transaction. The penalty was incurred, and the forfeiture attached from the very inception of the voyage, if it was commenced for the purpose of taking on board and transporting slaves. It is true that the penalty of this act of congress is levelled against American property employed in the manner prohibited. But I cannot think that the confiscation is limited to the American interest at the time she is engaged in the actual transportation of slaves. If such is the construction to be given to this act, it may be evaded with the utmost facility in every case. I cannot yield to the construction that the whole adventure must be performed whilst the vessel retains her American character and ownership. Where the change of ownership is a part of the scheme, the forfeiture attaches upon all interests concerned. The vessel becomes tainted with the offence wherever she may go, or into whatever hands she may fall. The ownership of this vessel, on her outward voyage, was certainly American The transfer of the title never did take place, the vessel never having arrived at Bona. The American interest was, therefore, forfeited, within the express terms of the law; and if the arrangement made with Teran, the purchaser, was for the purpose of evading the penalty of our law, he cannot claim any protection of his interest in the vessel in the courts of this country.

I am, accordingly, of opinion that the vessel became forfeited under the act of congress, and that the decree of the district court must be reversed, and a decree of condemnation entered.

Under the view of the case taken by the district judge, it did not become necessary to pass upon the question, whether the claimant, Tyng, has shown a lien in respect to his advances to the owner, which would be protected in case of condemnation of the vessel. But although, according to my view of the case, a decree of condemnation has passed against the vessel, I cannot conceive on what grounds the claimant can be entitled to his claim for advances. His whole claim rests upon his setting himself up as the sole owner of the vessel, which has been thrown upon him by her former owners, by reason of the first sale made by him to Martinez & Co.; the purchase-money having been paid over by him to them. It is the interest, therefore, of the claimant which has been adjudged forfeited; and a decree in his favor for the advance made by him, which was the whole purchase-money, would be directly repugnant to the decree of condemnation. The grounds upon which condemnation has been pronounced is, that he was an offending party, and implicated, in the whole arrangement made touching the adventure; and if so, he comes with an ill grace to ask for the protection of his interest, after being defeated in his illegal undertaking.

Nor do I see how the seamen's claim for wages can be sustained as a lien upon the vessel, according to the view taken by the supreme court of this law, in the case of U. S. v. Morris [supra]. Although they have in their claim denied having any knowledge that the vessel was to be engaged in any unlawful enterprise, yet nothing has been shown by them in any manner supporting this denial; and the circumstances disclosed, certainly show a prima facie case leading to a contrary conclusion. The two seamen who have petitioned for an allowance of their wages, are William Michael and James Foxcroft. I do not find their names on the crewlist, or in the shipping articles; but assuming them to have been a part of the crew, they must have known that the vessel was going on a voyage to the coast of Africa. There is no pretence of any misrepresentation to them in this respect. The shipping articles describe the voyage to be from Havana to the Isle of Principe, or to trade to other ports on the west coast of Africa, and for a voyage not to exceed eight months. No mention is made of a return of the vessel to Havana or elsewhere. But, from anything appearing on the face of the articles to the contrary, their services were to terminate on the coast of Africa, and they left there, or that they expected to be retained on board the vessel, in whatever service she might be engaged at the end of the eight months. This latter expectation was most likely what they hoped

to realize; and this affords very strong presumptive evidence that they understood, or had reason to believe, that the vessel was to be employed in the transportation of slaves; and if so, they were guilty of a criminal offence within the act of congress, now under consideration. Their claim for wages must, accordingly, be denied.

NOTE 1. For a full discussion of the intent of the act of congress of 1820, relative to the slave trade, see U. S. v. Battiste [Case No. 14,545].

NOTE 2. The statutes of the United States, on the subject of the slave trade, are as follows:—Be it enacted by the senate and house of representatives of the United States of America in congress assembled, that no citizen or citizens of the United States, or foreigner, or any other person coming into or residing within the same, shall, for himself or any other person whatsoever, either as master, factor or owner, build, fit, equip, load or otherwise prepare any ship or vessel, within any port or place of the said United States, nor shall cause any ship or vessel to sail from any port or place within the same, for the purpose of carrying on any trade or traffic in slaves, to any foreign country; or for the purpose of procuring from any foreign kingdom, place or country, the inhabitants of such kingdom, place or country, to be transported to any foreign country, port or place whatever, to be sold or disposed of as slaves: and if any ship or vessel shall be so fitted out, as aforesaid, for the said purposes, or shall be caused to sail, so as aforesaid, every such ship or vessel, her tackle, furniture, apparel and other appurtenances, shall be forfeited to the United States; and shall be liable to be seized, prosecuted and condemned, in any of the circuit courts or district court for the district where the said ship or vessel may be found and seized. 1 Stat. 347–349, § 1. That all and every person, so building, fitting out, equipping, loading or otherwise preparing or sending away any ship or vessel, knowing or intending that the same shall be employed in such trade or business, contrary to the true intent and meaning of this act, or anyways aiding or abetting therein, shall severally forfeit and pay the sum of two thousand dollars, one moiety thereof to the use of the United States, and the other moiety thereof to the use of him or her who shall sue for and prosecute the same. Id. § 2. That the owner, master or factor of each and every foreign ship or vessel, clearing out for any of the coasts or kingdoms of Africa, or suspected to be intended for the slave trade, and the suspicion being declared to the officer of the customs, by any citizen, on oath or affirmation, and such information being to the satisfaction of the said officer, shall first give bond with sufficient sureties, to the treasurer of the United States, that none of the natives of Africa, or any other foreign country or place, shall be taken on board the said ship or vessel, to be transported or sold as slaves in any other foreign port or place whatever, within nine months thereafter. Id. § 3. That if any citizen or citizens of the United States shall, contrary to the true intent and meaning of this act, take on board, receive or transport any such persons, as above described in this act, for the purpose of selling them as slaves, as aforesaid, he or they shall forfeit and pay, for each and every person so received on board, transported or sold as aforesaid, the sum of two hundred dollars, to be recovered in any court of the United States proper to try the same; the one moiety thereof to the use of the United States, and the other moiety to the use of such person or persons who shall sue for and prosecute the same. Approved, March 22, 1794. Id. § 4. Be it enacted by the senate and house of representatives of the United States of America, in congress assembled, that from and after the passing of this act, it shall not be lawful to import or bring, in any manner whatsoever, into the United States, or territories thereof, from any foreign kingdom, place or country, any negro, mulatto, or person of color, with intent to hold, sell or dispose of any such negro, mulatto, or person of color as a slave, or to be held to service or labor: and any ship, vessel or other watercraft, employed in any importation as aforesaid, shall be liable to seizure, prosecution and forfeiture, in any district in which it may be found; one-half thereof to the use of the United States, and the other half to the use of him or them who shall prosecute the same to effect. 3 Stat. 450, § 1. And be it further enacted, that no citizen or citizens of the United States, or any other person or persons, shall, after the passing of this act, as aforesaid, for himself, themselves, or any other person or persons whatsoever, either as master, factor or owner, build, fit, equip, load or otherwise prepare any ship or vessel, in any port or place within the jurisdiction of the United States, nor cause any such ship or vessel to sail from any port or place whatsoever within the jurisdiction of the same, for the purpose of procuring any negro, mulatto or person of color, from any foreign kingdom, place or country, to be transported to any port or place whatsoever, to be held, sold or otherwise disposed of, as slaves, or to be held to service or labor: and if any ship or vessel shall be so built, fitted out, equipped, laden or otherwise prepared for the purpose aforesaid, every such ship or vessel, her tackle, apparel, furniture and lading, shall be forfeited, one moiety to the use of the United States and the other to the use of the person or persons who shall sue for said forfeiture and prosecute the same to effect; and such ship or vessel shall be liable to be seized, prosecuted and condemned in any court of the United States having competent jurisdiction. Id. 451, § 2. And be it further enacted, that every person or persons so building, fitting out, equipping, loading, or otherwise preparing, or sending away, or causing any of the acts aforesaid to be done, with intent to employ such ship or vessel in such trade or business, after the passing of this act, contrary to the true intent and meaning thereof, or who shall in anywise be aiding or abetting therein, shall, severally, on conviction thereof, by due course of law, forfeit and pay a sum not exceeding five thousand dollars, nor less than one thousand dollars, one moiety to the use of the United States, and the other to the use of the person or persons who shall sue for such forfeiture and prosecute the same to effect, and shall, moreover, be imprisoned for a term not exceeding seven years, nor less than three years. Id. § 3. And be it further enacted, that if any citizen or citizens of the United States, or other person or persons resident within the jurisdiction of the same, shall, from and after the passing of this act, take on board, receive or transport, from any of the coasts or kingdoms of Africa, or from any other foreign kingdom, place or country, or from sea, any negro, mulatto or person of color, not being an inhabitant, nor held to service by the laws of either of the states or territories of the United States, in any ship, vessel, boat or other water-craft, for the purpose of holding, selling or otherwise disposing of such person as a slave, or to be held to service or labor, or be aiding or abetting therein, every such person or persons so offending, shall, on conviction by due course of law, severally forfeit and pay a sum not exceeding five thousand, nor less than one thousand dollars, one moiety to the use of the United States, and the other to the use of the person or persons who shall sue for such forfeiture and prosecute the same to effect; and, moreover, shall suffer imprisonment for a term not exceeding seven years nor less than three years: and every ship or vessel, boat or other water-craft, on which such negro, mulatto or person of color, shall have been taken on board, received or transported, as aforesaid, her tackle, apparel and furniture, and the goods and effects which shall be found on board the same, or shall have been imported therein in the same voyage, shall be forfeited, one moiety to the use of the

United States, and the other to the use of the person or persons who shall sue for and prosecute the same to effect; and every such ship or vessel shall be liable to be seized, prosecuted and condemned in any court of the United States having competent jurisdiction. Id. § 4. And be it further enacted, that if any person or persons, whatsoever shall, from and after the passing of this act, bring within the jurisdiction of the United States, in any manner whatsoever, any negro, mulatto or person of color, from any foreign kingdom, place or country, or from sea, or shall hold, sell or otherwise dispose of any such negro, mulatto or person of color, so brought in as a slave, or to be held to service or labor, or be in anywise aiding or abetting therein, every person so offending shall, on conviction thereof by due course of law, forfeit and pay, for every such offence, a sum not exceeding ten thousand nor less than one thousand dollars, one moiety to the use of the United States, and the other to the use of the person or persons who shall sue for such forfeiture and prosecute the same to effect; and, moreover, shall suffer imprisonment for a term not exceeding seven years nor less than three years. Id. 452, § 6. And be it further enacted, that in all prosecutions under this act, the defendant or defendants shall be holden to prove that the negro, mulatto or person of color, which he or they shall be charged with having brought into the United States, or with purchasing, holding, selling or otherwise disposing of, and which, according to the evidence in such case, the said defendant or defendants shall have brought in aforesaid, or otherwise disposed of, was brought into the United States at least five years previous to the commencement of such prosecution, or was not brought in, holden, purchased, or otherwise disposed of, contrary to the provisions of this act; and in failure thereof, the said defendant or defendants shall be adjudged guilty of the offence of which he or they may stand accused. Id. 453, § 8. And be it further enacted, that any prosecution, information or action may be sustained for any offence under this act, at any time within five years after such offence shall have been committed, any law to the contrary notwithstanding. Id. § 9. And be it further enacted, that if any citizens of the United States, being of the crew or ship's company of any foreign ship or vessel engaged in the slave trade, or any person whatever, being of the crew or ship's company of any ship or vessel, owned in the whole or part, or navigated for, or in behalf of, any citizen or citizens of the United States, shall land from any such ship or vessel, and, on any foreign shore, seize any negro or mulatto, not held to service or labor by the laws of either of the states or territories of the United States, with intent to make such negro or mulatto a slave, or shall decoy, or forcibly bring or carry, or shall receive such negro or mulatto on board any such ship or vessel, with intent as aforesaid, such citizen or person shall be adjudged a pirate; and on conviction thereof before the circuit court of the United States for the district wherein he may be brought or found, shall suffer death. Id. 600, § 4. And be it further enacted, that if any citizen of the United States, being of the crew or ship's company of any foreign ship or vessel engaged in the slave trade, or any person whatever, being of the crew or ship's company of any ship or vessel, owned wholly or in part, or navigated for, or in behalf of, any citizen or citizens of the United States, shall forcibly confine or detain, or aid and abet in forcibly confining or detaining on board such ship or vessel, any negro or mulatto not held to service by the laws of either of the states or territories of the United States, with intent to make such negro or mulatto a slave, or shall, on board any such ship or vessel, offer or attempt to sell, as a slave, any negro or mulatto not held to service as aforesaid, or shall, on the high seas, or anywhere on tidewater, transfer or deliver over, to any other ship or vessel, any negro or mulatto, not held to service as aforesaid, with intent to make such negro or mulatto a slave, or shall land or deliver on shore, from on board any such ship or vessel, any such negro or mulatto, with intent to make sale of, or having previously sold such negro or mulatto as a slave, such citizen or person shall be adjudged a pirate; and on conviction thereof before the circuit court of the United States for the district wherein he shall be brought or found, shall suffer death. Id. 601, § 4.

NOTE 3. The facts in the case of U. S. v. Morris, cited supra, together with the opinion of the court thereon, were stated by Chief Justice Taney, as follows:—"This case comes before us upon a certificate of division from the circuit court of the United States for the Southern district of New York, in the Second circuit. The defendant. Isaac Morris, is indicted under the second and third sections of the act entitled 'An act in addition to an act entitled "An act to prohibit the carrying on the slave trade from the United States to any foreign place or country," ' approved on the 10th of May, 1800. The first count of the indictment charges that the defendant did, on the high seas, from the 15th of June until the 26th of August, in the year 1839, voluntarily serve on board of the schooner Butterfly, a vessel of the United States, employed and made use of in the transportation of slaves from some foreign country or place, to some other foreign country or place, the said defendant being a citizen of the United States. The second count charges that the defendant did, on the high seas, from the 15th day of June to the 26th day of August, voluntarily serve on board of the schooner Butterfly, being a foreign vessel employed in the slave trade; the defendant being a citizen of the United States. It was proved on the trial, on the part of the prosecution, that the schooner Butterfly, carrying the flag of the United States, and documented as a vessel of the United States, sailed from Havana for the coast of Africa, on the 27th of July, 1839, having on board the usual and peculiar equipments of vessels engaged in the transportation of slaves from the coast of Africa to other places. Before she reached the African coast, and before any slaves were taken on board, she was captured by the Dolphin, a British brig-of-war, and carried into Sierra Leone; upon suspicion of being Spanish property, to be proceeded against in the mixed commission court at that place. At the time of her capture, Isaac Morris was in command of the vessel, and was described in the ship's papers and represented himself as a citizen of the United States. The court at Sierra Leone declined taking cognizance of the case, because the vessel was documented as an American vessel; and she was then sent to New York to be dealt with by the authorities of the United States as they might think proper.

"Upon the foregoing state of facts, the judges were divided in opinion upon the four following questions, which were presented on the facts aforesaid for their decision: (1) Whether it is necessary in order to constitute the offence denounced in the second section of the act of the 10th of May, 1800, above referred to, that there should be an actual transportation or carrying of slaves in the vessel of the United States, on board of which the party indicted is alleged to have served. (2) Whether it is necessary in order to constitute the offence denounced in the third section of the act of the 10th of May, 1800, above referred to, that there should be an actual transportation or carrying of slaves in a foreign vessel, on board of which the party indicted is alleged to have served. (3) Whether the voluntary service of an American citizen, on board a vessel of the United States, in a voyage commenced with the intent that the vessel should be employed and made use of in the transporting or carrying of slaves from one foreign country or place to another, is in itself, and where no slaves had been transported in such vessel, or received on board her, an offence under the said second section. (4) Whether the voluntary service of an

American citizen, on board a foreign vessel, in a voyage commenced with the intent that the vessel should be employed and made use of in the transportation and carrying of slaves from one foreign country or place to another. is in itself, and where no slaves have been transported in such vessel, or received on board her, an offence under the said third section. And these points having been certified to this court, we proceed to express our opinion upon them.

"The second section of the act of congress above mentioned. declares, 'that it shall be unlawful for any citizen of the United States, or other person residing therein, to serve on board any vessel of the United States. employed or made use of in the transportation or carrying of slaves from one foreign country or place to another: and any such citizen or other person voluntarily serving as aforesaid, shall be liable to be indicted therefor, and on conviction thereof shall be liable to a fine not exceeding two thousand dollars, and be imprisoned· not exceeding two years.' The first and third points certified from the circuit court, depend on the construction of this section. In expounding a penal statute the court certainly will not extend it beyond the plain meaning of its words; for it has been long and well settled, that such statutes must be construed strictly. Yet the evident intention of the legislature ought not to be defeated by a forced and overstrict construction. [U. S. v. Wiltberger] 5 Wheat. [18 U. S.] 95. The question in this case is. whether a vessel on her outward voyage to the coast of Africa. for the purpose of taking on board a cargo of slaves, is 'employed or made use of' in the transportation or carrying of slaves from one foreign country or place to another, before any slaves are received on board? To be 'employed' in anything, means not only the act of doing it, but also to be engaged to do it: to be under contract or orders to do it. And this is not only the ordinary meaning of the word, but it has frequently been used in that sense in other ·acts of congress. Thus. for example. the second section of the act of March 3. 1825 [4 Stat. 103], entitled 'An act to reduce into one, the several acts establishing and regulating the post-office department.' declares. 'that the postmaster-general, and all other persons "employed" in the general post-office. or in the care. custody, or conveyance of the mail, shall, previous to entering upon the duties assigned to them,' take the oath prescribed by that section. Here the persons who have contracted to perform certain duties in the general post-office, are described as 'employed' in that department, before they enter upon the duties assigned them. So, also, in the twenty-first section of the same law, various offences. such as the embezzling or destroying any letter, are enumerated, and the punishment prescribed, when committed by any person 'employed in any of the departments of the post-office establishment.' Yet it cannot be supposed that the party must be actually engaged in transacting his official duties when the letter was embezzled or destroyed. in order to constitute the offence described in this section. Again, Act July 29, 1813, § 8 (2 Story's Laws, 1353 [3 Stat. 49]), declares, that certain vessels 'employed' in the fisheries, shall not be entitled to the bounties therein granted, unless the master makes an agreement in writing or in print, with every fisherman employed therein before he proceeds on any fishing voyage.· Here the vessel is spoken of as 'employed' in the fisheries, before she sails on the voyage. So. also, Act March 3. 1831 (4 Story's Laws, 2256 [4 Stat. 492]), entitled 'An act concerning vessels employed in the whale -fishery,' authorizes vessels owned by any incorporated company, and 'employed wholly in the whale fishery,' to be registered or enrolled, and licensed in a particular manner, 'so long as any such vessel shall be wholly employed in the whale fishery.' The register or enrollment and license. must be obtained before the vessel sails on her outward voyage to the whaling grounds; and, consequently. in that voyage she must be 'em-

ployed' in the whale fishery, in the sense in which these words are used in the act of congress; otherwise, she would not be entitled to the register or enrollment and license authorized by this law. In like manner, the vessel in question was employed in the transportation of slaves. within the meaning of the act of congress of May 10, 1800, if she was sailing on her outward voyage to the African coast, in order to take them on board. to be transported to another foreign country. In such a voyage. the vessel is employed in the business of transporting and carrying slaves from one foreign country to another. In other words. she is employed in the slave trade. And any citizen of the United States. who shall voluntarily serve on board any vessel of the United States. on such a voyage, is guilty of the offence mentioned in the second section of this act of congress. It is hardly necessary to add, that 'voluntarily,' in this section, means, 'with knowledge' of the business in which she is employed. And in order to constitute the offence, the party must have knowledge that the vessel was bound to the coast of Africa, for the purpose of taking slaves on board, to be transported to some other foreign country. The same reasoning applies to the third section of the law, under which the second and fourth points certified to this court, have ·arisen. The vessel is 'employed in the slave trade' when sailing to the African coast for the purpose of taking the slaves on board. We, therefore, answer the first and second questions in the negative, and the third and fourth in the affirmative:. and it will be certified accordingly to the circuit court.